UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
TERELL VIERA,

                *Petitioner*,

      -against-

M. SHEAHAN, *Superintendent*,

                *Respondent*.
----------------------------------X

**<u>MEMORANDUM AND ORDER</u>**

16-CV-4048(KAM)

**KIYO A. MATSUMOTO, United States District Judge:**

        Terell Viera ("Petitioner" or "Mr. Viera"), acting *pro se*, brings a petition pursuant to 28 U.S.C. § 2254 seeking to vacate his May 2011 conviction in New York state court for manslaughter in the first degree, criminal possession of a weapon in the second degree, and bribery in the third degree. (*See* ECF No. 1, Petition for a Writ of Habeas Corpus ("Pet."); ECF No. 18-2, Amended Petition for a Writ of Habeas Corpus ("Am. Pet.").)  Mr. Viera argues that his conviction violated his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments.  (*Id.*)  For the reasons herein, both his petition and amended petition are DENIED in their entirety.

<u>**Background**</u>

        Petitioner was convicted following a jury trial in 2011 of, *inter alia*, the first-degree manslaughter of Elsmaker Iverson ("Mr. Iverson").  Mr. Iverson was shot and killed outside of a deli in Brooklyn, New York in November 2008.

1

Surveillance video showed Petitioner arguing with Mr. Iverson in the deli shortly before the shooting.  Two witnesses also witnessed the argument in the deli.  After the argument moved from the deli into the street, one of those witnesses saw Petitioner shoot Mr. Iverson, who later died.  Petitioner was initially charged with second-degree murder, but was ultimately convicted of first-degree manslaughter, as well as second-degree criminal possession of a weapon, and third-degree bribery. Petitioner appealed his conviction through the state court system, and now brings this petition for habeas relief in federal court.

### I.   The Investigation and Attempted Bribes

Police learned of Petitioner's involvement in the fatal shooting as a result of information provided by a witness to the shooting, Christopher Hodge ("Mr. Hodge").  (ECF No. 8, Affidavit in Opposition for a Writ of Habeas Corpus ("Opp. Aff."), ¶ 15; Am. Pet. ¶ 13.)  Mr. Hodge was arrested on December 16, 2008.  (Opp. Aff. ¶¶ 5, 14; Am. Pet. ¶ 13.)  After seeing a photo of a recent shooting victim, Mr. Iverson, at the police precinct, Mr. Hodge told a detective that he knew both Petitioner and Mr. Iverson, and that he witnessed Petitioner shooting Mr. Iverson.  (*Id.*)

On December 28, 2008, Petitioner was pulled over by police officer Angelo Pizarro ("Officer Pizarro") for making a

reckless maneuver while driving.  (Opp. Aff. ¶ 15; Am. Pet. ¶ 14.)  Petitioner told Officer Pizarro that his license was suspended and that he was in possession of someone else's license.  (Opp. Aff. ¶ 15.)  He was placed under arrest.  (*Id.*; Am. Pet. ¶ 14.)  On the way to the police precinct, Petitioner told Officer Pizarro that he had "a little something" for him if Officer Pizarro were to let him go after issuing only a summons. (*Id.*)  While at the police precinct, the arresting officers decided to record a debriefing of Petitioner to see if he would again offer a bribe, and Petitioner subsequently offered $560 to the officers in exchange for letting him go. (Opp. Aff. ¶ 16; Am. Pet. ¶ 15.)

Later that day, Detective John McDonald ("Detective McDonald") met with Petitioner and administered, for the first time, a *Miranda* warning.  (Opp. Aff. ¶ 17; Am. Pet. ¶ 16.) Petitioner waived his right to an attorney and agreed to answer questions.  (*Id.*)  Detective McDonald subsequently informed petitioner that he had been identified as the man who shot Mr. Iverson on November 2, 2008.  (Opp. Aff. ¶ 17.)  Petitioner denied any participation in the shooting, asserting that he had been at a home on Marcy Avenue in Brooklyn, New York at the time the shooting occurred, and that he only learned of the shooting from an instant message he received.  (Opp. Aff. ¶ 17; Am. Pet. ¶ 16.)

Petitioner was asked if he could verify that he was at the home on Marcy Avenue when the shooting took place, and Petitioner "did not do so." (Opp. Aff. ¶ 18; Am. Pet. ¶ 17.) Detective McDonald then informed Petitioner that he had been identified in a surveillance video arguing with the victim shortly before the shooting, at which time Petitioner became unresponsive to police questioning. (*Id.*) Petitioner was subsequently identified in lineups by two separate witnesses, including by Mr. Hodge, as the man who argued with the victim in the deli on the date of the shooting. (Opp. Aff. ¶ 19; Am. Pet. ¶ 18.) A grand jury indicted Petitioner of, *inter alia*, second-degree murder for the killing of Mr. Iverson, charging that Petitioner fatally shot the victim with intent to kill. (Am. Pet. ¶ 14.)

## II.  The Shooting of a Witness

At a pre-trial hearing on January 11, 2011, at which Petitioner was present, Detective McDonald testified about the lineup identifications of Petitioner, and identified one of the witnesses as an employee of the deli where the argument between Petitioner and the victim took place. (Opp. Aff. ¶ 20.) Two days later, on January 13, Roger Freeman ("Mr. Freeman"), who was allegedly a member of the same gang as Petitioner, visited Petitioner in jail. (*See* ECF No. 8-1, transcripts of pre-trial hearing, *voir* dire, trial, and sentencing proceedings ("Tr."),

4

at 76.)[1]  Four days later, on January 17, Petitioner's brother, along with Mr. Freeman and one other individual, picked up Kenneth Williams ("Mr. Williams") from the deli where he worked, took him to a rooftop, and shot him multiple times.  (Opp. ¶¶ 23-24.)  Mr. Williams survived the shooting.  Petitioner was never charged with a crime related to this shooting.

### III. The Trial, Conviction, and Sentence

Prior to trial, defense counsel moved to obtain the psychiatric records of Mr. Hodge, who was listed as a witness for the prosecution.  (Opp. Aff. ¶ 29; Am. Pet. ¶ 19.)  The court obtained records related to Mr. Hodge and reviewed them *in camera*.  (*Id.*)  The court declined to provide them to defense counsel, finding that nothing in the records was relevant to Mr. Hodge's ability to testify.  (*Id.*)

At trial, Mr. Hodge testified about what he witnessed regarding the shooting in November 2008.  (Opp. Aff. ¶ 28.)  Specifically, he testified that he witnessed an argument between Petitioner and the victim in the deli, and that Mr. Hodge saw Petitioner shoot the victim after the argument moved from inside the deli into the street.  (*See* Tr. at 415-18.)  On cross-examination, defense counsel attempted to elicit information

---

[1] The document uploaded by Respondents includes multiple transcripts within a single filing, including from pre-trial hearings, the trial, and sentencing.  Throughout this Memorandum and Order, citations to this filing include the ECF-generated page numbers of the filing, rather than the original page numbers on the individual transcripts.

about Mr. Hodge's alleged mental illness, and provided the court a document which allegedly indicated a diagnosis. (Opp. Aff. ¶ 30; Am. Pet. ¶ 22.)  The court, however, found that the document did not indicate a diagnosis, and imposed a fine on defense counsel for contempt. (Opp. Aff. ¶ 31; Am. Pet. ¶ 23.)  Defense counsel was allowed to cross-examine Mr. Hodge regarding a plea agreement from 2010, following Mr. Hodge's arrest for assaulting a police officer. (Opp. Aff. ¶ 28; Am. Pet. ¶ 20.)  The plea agreement required Mr. Hodge to attend a one-year treatment program for substance abuse and anger management issues. (*Id.*) During cross-examination, Mr. Hodge denied assaulting the officer, and testified that he had taken the plea deal because it was preferable to spending time in jail. (*Id.*)

Pierna Laine ("Ms. Laine"), another eyewitness to the shooting of Mr. Iverson, also testified at trial. (*See* Tr. at 324-29.)  Ms. Laine did not know the Petitioner or the victim, but testified that she saw two men arguing in the street from her window on the date of the shooting, and then heard a gunshot. (*Id.* at 326-27.)  Ms. Laine's testimony corroborated certain details from Mr. Hodge's testimony, including a description of the clothing Petitioner was wearing at the time of the shooting. (*Id.* at 327.)

Mr. Williams also testified at trial, including about the incident in which he was shot after being identified as a potential witness. (*See* Tr. at 280.)

In addition to the aforementioned witness testimony, the prosecution also introduced the surveillance video showing Petitioner arguing with Mr. Iverson in the deli shortly before Mr. Iverson was shot (*id.* at 270-73), and audio recordings of Petitioner attempting to bribe police officers (*see, e.g.*, *id.* at 498-99.)

The jury acquitted Petitioner of second-degree murder, but convicted him of first-degree manslaughter, second-degree criminal possession of a weapon, and third-degree bribery. (Opp. Aff. ¶ 34; Am. Pet. ¶ 31.)  On May 5, 2011, Petitioner was sentenced to consecutive sentences of 25 years (manslaughter), 15 years (criminal possession of a weapon), and between two-and-a-third to seven years (bribery), respectively, along with periods of post-release supervision. (*Id.*)

## IV.  The Appeal

Petitioner appealed his conviction to the Supreme Court, Appellate Division, Second Department, raising numerous issues regarding the trial court's rulings on admissibility (in particular, the court's ruling excluding Mr. Hodge's psychiatric records), the sentence, and Petitioner's questioning by police. (Opp. Aff. ¶¶ 35-37; Am. Pet. ¶¶ 6-10.)  The Appellate Division

affirmed the conviction, holding that the trial court acted
properly, any errors were harmless, and that several issues
raised by Petitioner were not preserved for appellate review.
*People v. Viera*, 18 N.Y.S.3d 706 (2d Dep't 2015).  Petitioner
sought leave to appeal to the New York Court of Appeals, and was
denied by certificate on February 1, 2016.  *People v. Viera*, 26
N.Y.3d 1151 (2016).

## V.   The Instant Petitions

Petitioner filed a petition for a writ of habeas
corpus with this court on July 15, 2016 (*see generally* Pet.),
and, with permission of the court, filed an amended petition on
February 9, 2017 (*see generally* Am. Pet.).[2]  Generally, an
amended petition replaces a petitioner's first petition. *See,
e.g., King v. Cunningham*, 442 F. Supp. 2d 171, 178 (S.D.N.Y.
2006).  Mr. Viera's amended petition asserts four grounds for
relief: that the trial court's denial of defense counsel's

---

[2] Petitioner's application for appeal was denied by the Court of
Appeals on February 1, 2016, and Petitioner thereafter had 90 days to
file a petition for certiorari with the United States Supreme Court,
U.S. Sup. Ct. R. 13(1), i.e., by May 1, 2016.  Accordingly, the one-
year statute of limitations covering this petition for habeas relief
began to run on May 1, 2016, and expired on May 1, 2017.  *See* 28 U.S.C
§ 2244(d)(1); *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001) (The
"limitations period . . . does not begin to run until the completion
of direct appellate review in the state court system and either the
completion of certiorari proceedings in the United States Supreme
Court, or—if the prisoner elects not to file a petition for
certiorari—the time to seek direct review via certiorari has
expired.").  Petitioner's amended petition, filed in February 2017,
was therefore timely regardless of whether it related back to his
first petition.

motion to view Mr. Hodge's psychiatric records, as well as the
striking of a series of questions on cross-examination related
to those records, violated petitioner's rights under the
confrontation clause of the Sixth Amendment of the Constitution
(Am. Pet. at 14-21.); that his Fifth Amendment rights were
violated when the trial court constructively amended the
indictment by adding the lesser charge of first-degree
manslaughter (*id.* at 66-70); that the admission of Petitioner's
statements in which he offered police officers a bribe violated
his Fifth Amendment rights, because they occurred before he was
provided with a *Miranda* warning (*id.* at 79-83); and that his
right to due process was violated when the trial court permitted
the prosecution to introduce evidence of Petitioner's post-
arrest silence (*id.* at 90).

Given Mr. Viera's *pro se* status and the fact that both
of his petitions were filed within the applicable one-year
statute of limitations, the court will also consider the grounds
asserted in his first petition that he did not assert in his
amended petition. *See Erickson v. Pardus*, 551 U.S. 89, 94
(2007) ("a *pro se* complaint, however inartfully pleaded, must be
held to less stringent standards than formal pleadings drafted
by lawyers") (quotation omitted). Petitioner's first petition
sought relief on the same grounds as his amended petition, plus
two additional grounds that the court will consider: that he was

denied due process when the trial court allowed prejudicial evidence of his gang affiliation and the uncharged shooting of Mr. Williams (Pet. at 17); and that his sentence was excessive (*id.* at 4).[3]

Following the filing of his petition and amended petition, Petitioner submitted a letter providing an additional exhibit to the court — the transcript of Mr. Hodge's July 2010 plea hearing — and requested that the court assist in obtaining additional records related to Mr. Hodge (ECF No. 22), which Respondent opposed (ECF NO. 25).  Petitioner subsequently submitted further papers and documents.  (ECF No. 27.) Petitioner then requested that (1) this action be stayed while he attempted to obtain additional documents by means of New York's Freedom of Information Law, and (2) the court allow him to seek discovery of certain documents.  (ECF No. 30.)  The court will discuss Petitioner's discovery requests below before turning to the merits of his asserted grounds for relief.

## Legal Standard

Title 28 U.S.C. § 2254 provides that "a district court shall entertain an application for a writ of habeas corpus on

---

[3] Mr. Viera's petition also briefly asserts that his due process rights were violated because the police failed to preserve exculpatory evidence.  (Pet. at 4.)  However, Mr. Viera does not expand on this allegation at all, or provide any indication of what the unpreserved evidence was.  Accordingly, the court denies this ground because Mr. Viera did not provide sufficient detail and did not raise it in his amended petition.

behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The application shall not be granted to any claim adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the [United States Supreme Court]" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

In order to hold that a state court adjudication was "contrary to" a United States Supreme Court holding, the federal habeas court must conclude that the state court either arrived at a conclusion that is the "opposite" of the conclusion reached by the Supreme Court on a question of law, or has "decide[d] a case differently than th[e Supreme] Court has on a materially indistinguishable set of facts."  *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000).  In order to hold that the state court's adjudication constituted "an unreasonable application of" a Supreme Court holding, the district court must conclude that "the state court identifie[d] the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably

11

applie[d] the principle to the facts of the prisoner's case."

*Id.* at 413.  "[T]his standard is difficult to meet . . . because it was meant to be."  *Harrington v. Richter,* 562 U.S. 86, 102 (2011).  "[F]ederal habeas relief functions . . . not as a means of error correction," but rather "as a guard against extreme malfunctions in the state criminal justice systems."  *Greene v. Fisher,* 565 U.S. 34, 43 (2011).

## Discussion

### I.   Requests for Discovery

Following the filing of his petition and amended petition, Petitioner asked that this court "have the court clerk or the prosecutor on [Mr. Hodge's criminal] case make available . . . a copy of the approved 'writing treatment plan' filed with the court and accepted by the court on the behalf of the People's own witness, [Mr.] Hodge . . . ."  (ECF No. 22, Oct. 7, 2017 Letter from Petitioner, at 5.)  The "writing treatment plan" sought by Petitioner purportedly relates to court-ordered treatment that resulted from Mr. Hodge's plea agreement. Petitioner filed an additional request for "a time tolling of the proceeding for time to obtain documents [he] requested via [New York's Freedom of Information Law]" related to Mr. Hodge, and asked this court "to allow [him] the use of discovery in this proceeding in accordance" with Federal Rule of Civil

Procedure 26.  (ECF No. 30, Jan. 16, 2020 Letter from
Petitioner, at 1-2.)

"A habeas petitioner, unlike the usual civil litigant
in federal court, is not entitled to discovery as a matter of
ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).
A petitioner is entitled to discovery if he can show "good
cause," i.e., where the "specific allegations before the court
show reason to believe that the petitioner may, if the facts are
fully developed, be able to demonstrate that he is entitled to
relief." *Id.* at 908-09 (quotation and alteration omitted).
Moreover, it is well-established that federal courts reviewing
habeas petitions are "generally confined to the record before
the state court that adjudicated the claim." *Jackson v. Conway*,
763 F.3d 115, 132 (2d Cir. 2014); *see Cullen v. Pinholster*, 563
U.S. 170, 181 (2011) ("We now hold that review under §
2254(d)(1) is limited to the record that was before the state
court that adjudicated the claim on the merits.").

Petitioner asserts that documents from Mr. Hodge's
criminal proceeding would be relevant to his petition, because
Mr. Hodge was one of the key witnesses against him at trial.
The court, however, does not find "good cause" to order
additional discovery.  In response to an order of this court,
Respondent filed under seal the documents related to Mr. Hodge
that the trial court reviewed *in camera* during Petitioner's

13

criminal trial.  (*See* ECF No. 5, Order to Show Cause; ECF No. 7, Motion for Leave to File Document Under Seal; ECF No. 8, Response to Order to Show Cause.)  This court is limited to the record that was before the trial court, *Cullen*, 563 U.S. at 181, and additional discovery would go beyond that record.  Further, the plea transcript that supposedly references the "writing treatment plan" sought by Petitioner is dated July 13, 2010, meaning it was available to Petitioner at the time of his criminal trial in 2011.  Indeed, Petitioner's counsel used Mr. Hodge's plea agreement to cross-examine Mr. Hodge at trial, and specifically raised the conditions placed on Mr. Hodge as a result of his plea.  (*See* Tr. at 444-45.)

Accordingly, the court is satisfied that it has a sufficient record before it, and Petitioner has not met his burden to show "good cause" warranting additional discovery. *See Beltran v. Keyser*, No. 15-cv-7201, 2018 WL 1175134, at *2 (E.D.N.Y. Mar. 5, 2018) (a "petitioner 'bears a heavy burden in establishing a right to discovery'") (quoting *Renis v. Thomas*, No. 02-cv-9256, 2003 WL 22358799, at *2 (S.D.N.Y. Oct. 16, 2003)).

To the extent that Petitioner submitted additional documents to the court in his more recent filings that exceed the record that was before the state trial court during his criminal trial, the court will not consider those documents in

14

deciding whether Petitioner is entitled to relief.  *See Cullen*, 563 U.S. at 181; *Jackson*, 763 F.3d at 132.

## II.  Ground One: Right to Confront Witnesses

Petitioner's first claim is related to the trial court's refusal to release Mr. Hodge's psychiatric records to defense counsel during trial.  Petitioner contends he was deprived his Sixth Amendment right to confront the witness because his counsel was prevented from questioning Mr. Hodge about his supposed mental illness.  (*See* Am. Pet. at 12-21.) This claim is without merit.

A defendant's Sixth Amendment right to confront adverse witnesses is guaranteed in both state and federal criminal proceedings.  *See generally Pointer v. Texas,* 380 U.S. 400 (1965).  The right includes both being allowed to physically confront the witnesses, as well as the opportunity to thoroughly cross-examine them.  *Davis v. Alaska,* 415 U.S. 308, 318 (1974). That right, however, is not unlimited, and "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Delaware v. VanArsdall,* 475 U.S. 673, 679 (1986).  When the cross-examiner intends to utilize the contents of confidential, privileged, or

otherwise sensitive information, it is normal practice for the trial court to review the information *in camera*, and to make a determination about whether the information is appropriate for cross-examination. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 60-61 (1987).

An individual's psychiatric records are confidential, and such records should be used on cross-examination only when "their confidentiality is significantly outweighed by the interest of justice." *Delio v. People of State of New York*, No. 02-cv-5258, 2003 WL 22956953, at *12 (E.D.N.Y. Oct. 21, 2003) (quoting *People v. Duran*, 713 N.Y.S.2d 561, 562 (2nd Dep't 2000)). "It is normal practice for the trial court to review [psychiatric records] *in camera* to ascertain if the report contains any relevant information for the purposes of cross-examination." *Id.* at *13 (citing *Ritchie*, 480 U.S. 39).

Here, that is precisely what the state trial court did. The trial judge reviewed Mr. Hodge's psychiatric record, made a determination that Mr. Hodge's ability to testify would not be affected by any mental health condition, and thus prevented use of the record for cross-examination. Trial judges in both federal and state court routinely make similar determinations, which are squarely within their discretion. *See, e.g.*, *United States v. Crowley*, 318 F.3d 401, 419 (2d Cir. 2003) ("[W]hile evidence of a witness's psychological history

16

may be relevant to the witness's credibility, courts should carefully weigh the probative value of such evidence . . . ."); *United States v. Wilson*, 493 F. Supp. 2d 477, 480 (E.D.N.Y. 2006); *Delio*, 2003 WL 22956953, at *13.

Accordingly, Petitioner has not shown that the trial court's decision to prevent cross-examination of Mr. Hodge based on his psychiatric records deprived him of his Sixth Amendment right to confront Mr. Hodge. The records in question were filed in this matter under seal, and this court found nothing in them indicating that the trial court erred by not allowing Petitioner to use them on cross-examination. Moreover, defense counsel was able to cross-examine Mr. Hodge about his plea agreement and the resulting requirement for Mr. Hodge to receive certain treatment. Petitioner was therefore not deprived of his constitutional right to confront Mr. Hodge.[4]

### III. Ground Two: Constructive Amendment of the Indictment

The second claim raised by Petitioner is that the court deprived him of his rights under the Fifth Amendment by

---

[4] Petitioner also argued in his first petition that he was denied effective assistance of appellate counsel because the Appellate Division did not provide his appellate counsel with access to Mr. Hodge's records. (Pet. at 8.) An ineffective assistance of counsel claim, however, must focus on the performance of counsel, not whether a court provided counsel with access to material, and Petitioner does not allege any facts suggesting that his counsel's performance was deficient. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (a "defendant must show that counsel's performance was deficient").

constructively amending the grand jury indictment to include, in addition to the charge of second-degree murder, the lesser charge of first-degree manslaughter, the latter of which Petitioner was ultimately convicted.  This claim is without merit, because the United States Constitution does not prohibit state courts from constructively amending indictments to include lesser offenses.

The Fifth Amendment guarantees that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." U.S. Const. amend. V.  In *federal* criminal cases, an indictment that is amended outside of the grand jury process constitutes a *per se* violation of the Fifth Amendment right to be indicted by a grand jury.  *See United States v. Clemente,* 22 F.3d 477, 482 (2d Cir. 1994).  The Fifth Amendment right to a grand jury indictment, however, "has not been incorporated against the states through the Fourteenth Amendment."  *LanFranco v. Murray*, 313 F.3d 112, 118 (2d Cir. 2002) (citing *Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972)).

Accordingly, Petitioner's argument that the indictment was improperly amended is a matter of New York state constitutional law.  *See People v. Perez*, 83 N.Y.2d 269, 276 (1994).  Under New York law, "if a court determines that a lesser offense is supported by legally sufficient evidence, it

18

has the authority to direct that the count of the indictment be amended so as to charge the lesser offense." *People v. Marini*, 570 N.Y.S.2d 360, 360 (2nd Dep't 1991).  Moreover, it should be noted that the lesser charge of manslaughter was added at Petitioner's request.  (*See* Tr. at 553-55.)

In any event, the role of this court in reviewing a petition for habeas relief is limited to determining whether Petitioner's conviction was in violation of the United States Constitution or the laws of the United States.  *See* 28 U.S.C. § 2254(a).  While the Constitution prohibits amending an indictment outside the presence of a grand jury, it does not prohibit a defendant's conviction for an offense that is a lesser included offense in the offense charged in the indictment.  *See United States v. Taylor*, 816 F.3d 12, 19 (2d Cir. 2016) (A "conviction for a lesser included offense of the offense charged in the indictment . . . is entirely appropriate under Federal Rule of Criminal Procedure 31(c).").  Petitioner's contention that the amendment of the indictment violated the Fifth Amendment is without merit.

### IV.  Ground Three: Admission of Statements Made Before *Miranda* Warning

The third claim raised by Petitioner is that admission of his statements to Officer Pizarro, and the subsequent statements he made at the police precinct, violated the Fifth

Amendment because they occurred before he was provided with a *Miranda* warning.

Criminal suspects are entitled under the Constitution to be advised of their rights to remain silent and to an attorney before law enforcement conducts a "custodial interrogation" of the suspect. *Rhode Island v. Innis,* 446 U.S. 291, 297 (1980) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). It is well-established that if a suspect makes statements that are voluntarily or spontaneous, before an interrogation begins, a *Miranda* warning is not required for those statements to be admissible against the suspect. *See id.* at 300-01 ("the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent"); *United States v. Badr,* 604 F.Supp 569, 578-79 (E.D.N.Y. 1985) ("Volunteered statements of any kind and spontaneous, unprovoked, incriminating statements are not barred by the Fifth Amendment.").

Officer Pizarro testified that Petitioner told him that Petitioner would have "a little something" for him if he let Petitioner "go on a summons." (Tr. at 493.) This statement was made while Officer Pizarro was transporting Petitioner to the police precinct. (*Id.*) There is no evidence that Petitioner's statement was made in response to a question from Officer Pizarro. The statement, therefore, was voluntarily made

20

by Petitioner, and thus did not require a *Miranda* warning to be
admissible against him.  *See United States v. Bravo*, 403 F.
Supp. 297, 304 (S.D.N.Y. 1975) (statements offering a bribe that
are "voluntary and spontaneous and not the result of any
physical or psychological coercion," and are "'not in response
to custodial interrogation, are not barred by the Fifth
Amendment'") (quoting *United States v. Martin*, 511 F.2d 148, 151
(8th Cir. 1975)); *see also United States v. Gentile*, 525 F.2d
252, 259 (2d Cir. 1975).

Once Petitioner arrived at the police precinct, the
arresting officers decided to record a debriefing of Petitioner
to see if he would again offer a bribe. (Opp. Aff. ¶ 16; Am.
Pet. ¶ 15.)  Despite coming before a *Miranda* warning was
administered, the statements made by Petitioner in this setting
were admissible.  "[I]t has long been the rule that [when] [a]
defendant . . . without provocation seeks to buy his way out by
offering a bribe to the arresting officer," that defendant "may
be questioned by the officer as to anything legitimately related
to the bribe offer."  *People v. Flynn*, 789 N.Y.S.2d 33, 35 (1st
Dep't 2005) (quotation omitted).  Petitioner's offer of a bribe
in that situation constituted an "independent crime," and a
recording of those statements is "admissible where it is a usual
investigation practice to obtain a recording."  *Id.* (quotation
omitted); *see Gentile*, 525 F.2d at 259 ("A failure to give

*Miranda* warnings, however, even in a custodial setting, would not prevent a prosecution for an attempt to bribe a law enforcement officer made subsequent to the arrest.").

Accordingly, the admission of Petitioner's statements in which he attempted to bribe police officers did not violate his rights under the Fifth Amendment.

### V.     Ground Four: Admission of Post-Arrest Silence

Petitioner's next claim for relief is based on the evidence of his post-arrest silence.

The Fifth Amendment prevents an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see Boddie v. New York State Div. of Parole,* 288 F.Supp. 2d 431, 441 (S.D.N.Y. 2003) ("The Fifth Amendment protects against compelled self-incrimination in a criminal prosecution.")  The United States Supreme Court has held that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California,* 380 U.S. 609, 615 (1965).  However, "once an arrestee waives his right to remain silent, the government is entitled to introduce evidence at trial of the arrestee's silence in response to questions, and the government may comment on that silence during summation, as long as the arrestee did not resurrect and assert his right to remain silent. *Hogan v.*

*Ercole,* No. 05-cv-5860, 2011 WL 3882822, at *10 (E.D.N.Y. Sept. 2, 2011).

The Second Circuit has directly addressed a situation analogous to Petitioner's.  In *United States v. Pitre*, the defendant was provided a *Miranda* warning, but nonetheless made statements to a federal law enforcement agent during a post-arrest interview.  960 F.2d 1112, 1124-25 (2d Cir. 1992).  After answering multiple questions, the defendant refused to respond to one question.  *Id.*  The agent testified to this fact, and the prosecutor made use of it in his summation.  *Id.*  The Second Circuit held that because the defendant waived his right to remain silent by making post-arrest statements, unless he resurrected and asserted this right, the government was entitled to introduce the evidence of his refusal to answer a question at trial.  *Id.* at 1125.

Here, Petitioner made post-arrest statements to Detective McDonald after he was given a *Miranda* warning, and only refused to answer certain questions after Detective McDonald informed him of the surveillance video showing the argument in the deli.  Because Petitioner did not resurrect and assert his right to remain silent, the court did not deprive Petitioner of his rights by allowing evidence of Petitioner's silence in response to certain questions.

Accordingly, this claim is, likewise, rejected.

23

## VI.  Ground Five: Admission of Prejudicial Evidence

In his first petition, Petitioner averred that his due process rights were violated by the introduction of "[i]rrelevant but highly prejudicial evidences of Petitioner's alleged gang affiliation," and "[e]xtensive evidence of the an uncharged shooting of a prosecution witness, despite the absence of clear and convincing evidence against Petitioner."  (Pet. 17.)  Petitioner did not renew these arguments in his amended petition, but as stated above, given Petitioner's *pro se* status and the fact that both of his petitions were timely filed, the court will consider them.

"State trial court evidentiary rulings generally are not a basis for habeas relief."  *Oliver v. Kirkpatrick*, No. 06-cv-6050, 2012 WL 3113146, at *6 (E.D.N.Y. July 31, 2012) (citing *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir.2012)).  "Even if unfairly prejudicial evidence was erroneously admitted at trial, to amount to a denial of due process, the evidence must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."  *Id.* (quotation and alterations omitted).

### A. Evidence of Petitioner's Alleged Gang Affiliation

This court finds that evidence of Petitioner's gang affiliation was properly admitted, and even if it was not, it was not so prejudicial as to rise to the level of a due process

24

violation.  In order to grant habeas relief, this court would have to first find that the state trial court's ruling was inconsistent with federal law.  "Federal Rules of Evidence 403 and 404 . . . permit the introduction of character evidence and evidence of prior bad acts, where such evidence is relevant and its probative value is not substantially outweighed by a danger of unfair prejudice."  *Oliver*, 2012 WL 3113146, at *7.

        Before admitting evidence of Petitioner's alleged gang affiliation, the state trial court in Petitioner's case undertook a similar analysis to that required under federal law. The judge explicitly asked the prosecution, "How is the gang membership relevant[?]"  (Tr. at 74.)  The prosecution explained that it was relevant to certain witnesses' ability to identify Petitioner, because two witnesses knew him to be a member of a certain gang.  (*Id.*)  The court allowed the prosecution to ask those witnesses about Petitioner's gang affiliation, but provided a limiting instruction to the jury:

> Ladies and gentlemen[,] there may be some testimony
> concerning people who know each other through a
> gang. . . .  I want to caution you that being a member
> of a gang cannot be used for any other reason.  It
> can't be used to show any propensity for the defendant
> to commit this crime or any other crime.  It's used
> for completing the narrative of how people know each
> other and who knows who.  That is the only reason it's
> being mentioned at this time.

(Tr. at 412.)

Allowing the witnesses to testify about how they knew and could identify Petitioner, and instructing the jury not to use that information for any other purpose, was a proper exercise of the trial judge's discretion. *See Murray v. People of New York*, No. 15-cv-3555, 2017 WL 3704677, at *8 (E.D.N.Y. Aug. 28, 2017) (denying habeas petition where "there [was] no basis to conclude that the trial court's admission of the evidence regarding gang affiliation by the petitioner was erroneous"). Moreover, even if the evidence was erroneously admitted, this court cannot find that it was so prejudicial so as to amount to a constitutional violation, in part because the judge instructed the jury that it should not consider the evidence for any purpose other than to "complet[e] the narrative." (Tr. at 412.) "As the Supreme Court has frequently observed, the law recognizes a strong presumption that juries follow limiting instructions." *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006).

> B. <u>Evidence Related to the Shooting of a Witness</u>

The introduction of evidence of the shooting of Mr. Williams requires a more complex analysis. During the prosecution's opening statement at Petitioner's trial, the prosecutor told the jury:

> You are going to learn on January 17th, 2011, the night before jury selection, this defendant's brother, Shamar, [Mr.] Freeman, and some others took [Mr.]

26

> Williams to an area in the 75th precinct in Brooklyn,
> brought him up to a rooftop, and shot him four times:
> Not trying to scare him, trying to kill him so he
> could not testify at this trial.

(Tr. at 219.)  Mr. Williams then testified at trial (over

Petitioner's objection) that in the course of the shooting,

"[e]verybody was asking [him] why did [he] snitch on

[Petitioner]."  (*Id.* at 280.)  During the prosecution's closing

argument, the prosecutor told the jury:

> So when the defense attorney gets up here and he tells
> you Shamar, the defendant's brother, [and
> Petitioner's] friend [Mr.] Freeman, the person you
> heard took over his gang Hard Body Crew when this
> defendant was incarcerated, wanted to "shoot a
> snitch."  Why on earth would they do that, when they
> had him on that roof, [Mr.] Williams told you [he]
> said, "That's what you get or for [*sic*] snitching on
> [Petitioner].  He's coming home."  He's the only
> person that's going to benefit from [Mr.] Williams not
> being able to walk through this door and testify
> against him.

(*Id.* at 616.)  There was no limiting instruction provided to the

jury during the prosecution's opening statement, during Mr.

Williams's testimony, or during the prosecution's closing

statement.

Petitioner, who was detained at the time Mr. Williams

was shot, was never charged with a crime related to that

shooting.  "Evidence of uncharged crimes is generally

inadmissable so that the jury does not convict the defendant

based on a perceived predisposition towards criminal conduct

that is deserving of punishment rather than for guilt of the

27

charged offense." *Roldan v. Artuz*, 78 F. Supp. 2d 260, 277
(S.D.N.Y. 2000) (collecting cases).  The trial court allowed Mr.
Williams's testimony as evidence of Petitioner's consciousness
of guilt.  (*See* Tr. at 81-82, 196-97.)

Generally, "an effort to intimidate a key prosecution
witness [is] probative of [a defendant's] state of mind," i.e.,
his consciousness of guilt.  *United States v. Mickens*, 926 F.2d
1323, 1329 (2d Cir. 1991).  The wrinkle in this case is that the
admitted testimony did not describe Petitioner's intimidation of
a witness; it described intimidation of and an attempt to
eliminate a witness undertaken by Petitioner's brother and
others while Petitioner was in jail.  The record shows that one
of the individuals involved in the shooting, Mr. Freeman,
visited Petitioner in jail between the date on which a detective
identified an employee of the deli as a witness in open court
and the date on which Mr. Williams was shot.  (*See* Tr. at 76.)

The trial court admitted this evidence as probative of
Petitioner's consciousness of guilt.  In general, a defendant's
consciousness of guilt may be shown when that defendant takes
some action to intimidate a witness.  *See Mickens*, 926 F.2d at
1328 (allowing testimony that defendant "made a hand gesture in
the shape of a gun as the [witness] entered the courtroom to
testify"); *United States v. Bein*, 728 F.2d 107, 114-15 (2d Cir.
1984) ("Evidence of threats by a defendant against a potential

28

witness against him can, if [the Federal Rules of Evidence's] balancing test is met, be used to show guilty knowledge."). The reason evidence of threats or acts by a defendant is probative, and thus admissible, is "because the evidence exposes the defendant's consciousness regarding his belief that his case is weak or unfounded and shows consciousness of guilt." *United States v. Hurley*, 454 F. App'x 175, 178 (4th Cir. 2011).

It does not necessarily follow, however, that the actions of others would have any probative value with respect to a defendant's consciousness of guilt, unless the defendant directed the others to act, or at least approved of their actions. *See United States v. Zierke*, 618 F.3d 755, 759 (8th Cir. 2010) (defendant's "comments to his son indicat[ing] a desire that the son eliminate witnesses against him" admissible to show consciousness of guilt). There was nothing linking Petitioner to the shooting of Mr. Williams other than Petitioner's connection to the people involved, and the fact that Mr. Freeman visited Petitioner in jail after a deli employee was identified as a witness, days before the shooting. There was no direct evidence that Petitioner directed anyone to shoot Mr. Williams, that he approved of the shooting, or that he knew about it in advance. The prosecution referenced Petitioner's and Mr. Freeman's connection through their alleged gang affiliation, but as discussed above, evidence of

29

Petitioner's gang affiliation was admitted only to show how
witnesses knew Petitioner; it was not to be used to suggest that
Petitioner was involved in the shooting of Mr. Williams.  As
Petitioner argues, his brother and Mr. Freeman "may well have
acted independently of Petitioner, prompted solely by misplaced
loyalty to a family member or friend."  (Pet. at 16.)

Even if the state trial court erred in admitting
evidence related to the shooting of Mr. Williams, that error, on
its own, is not enough to grant Mr. Viera's petitions.  This
court must also consider whether "the evidence [was]
sufficiently material to provide the basis for conviction or to
remove a reasonable doubt that would have existed on the record
without it."  *Oliver*, 2012 WL 3113146, at *6.  This is a very
high bar, and this court would have to find that the state trial
court's ruling was not only incorrect, but that the
"introduction of [the] evidence was 'so extremely unfair that
its admission violated fundamental conceptions of justice.'"
*Sandoval v. Lee*, No. 14-cv-5187, 2016 WL 2962205, at *5
(E.D.N.Y. May 20, 2016) (quoting *Dowling v. United States*, 493
U.S. 342, 352 (1990)) (alterations omitted).

Respondents argue that "any error was harmless because
of the overwhelming evidence of [Petitioner]'s guilt."  (Opp. at
24.)  For a summation of this "overwhelming evidence,"
Respondents direct the court to the brief it filed in

30

Petitioner's state court appeal.  (*See id.* at 21.)  The evidence

of guilt highlighted by Respondents includes:

- the "eyewitness testimony from [Mr.] Williams and [Mr.] Hodge describing the initial argument between" Petitioner and Mr. Iverson in the deli, "and a surveillance videotape showing the argument";
- "testimony from [Mr.] Hodge and [Ms.] Laine regarding their observations of the shooting"; and
- Petitioner's "consciousness of guilt, as reflected by his attempt to bribe his arresting officer, his false alibi, and his complicity in the attempt to kill and thereby silence [Mr.] Williams before trial."

(ECF No. 8-5, Respondents' Appellate Brief, at 51.)

        In sum, absent evidence of the shooting of Mr.

Williams, the evidence against Petitioner at trial was the

testimony and surveillance video showing the argument with the

victim before the shooting, the testimony of two eyewitnesses to

the shooting, Petitioner's subsequent attempt to bribe a police

officer, and his relaying a false alibi regarding his

whereabouts at the time of the shooting.  Given this evidence,

particularly the fact that there were two eyewitnesses to the

shooting of Mr. Iverson and a video showing Petitioner arguing

with Mr. Iverson shortly before the shooting, the court finds

that the evidence of the shooting of Mr. Williams does not

"remove a reasonable doubt that would have existed on the record

without it," *Oliver*, 2012 WL 3113146, at *6, and admission of

the evidence did not "violate[] fundamental conceptions of justice," *Dowling*, 493 U.S. at 352.

Mr. Hodge, who knew both Petitioner and Mr. Iverson previously, testified at trial that he was in the deli during the initial argument between Petitioner and Mr. Iverson.  (Tr. at 416.)  Mr. Hodge then went to a rooftop to eat a sandwich, and he could hear the argument between Petitioner and Mr. Iverson continue in the street outside the deli.  (Tr. at 417-18.)  When Mr. Hodge came down from the rooftop, he heard Mr. Iverson say, "[I]f you [are] going to shoot me, then shoot." (*Id.* at 418.)  He testified that Petitioner then shot Mr. Iverson.  (*Id.* at 419.)  Mr. Hodge testified that the "[n]ext thing [he] remember[ed] happening [was] that [Mr. Iverson] [was] laying on the floor . . . and then a Puerto Rican dude [brought] him towards the stairway of the park and put a little pillow under his head and called the police."  (*Id.* at 420.)  Mr. Hodge also testified that at the time of the shooting, Petitioner was wearing "a black hoodie" and "dark blue Levi jeans with some Nikes" that were "all black with, like, some kind of X lines on them."  (*Id.* at 415.)

Ms. Laine, who did not know Petitioner or Mr. Iverson previously, testified at trial that she saw two men arguing in the street outside the deli from her window, and that one man was taller than the other.  (*Id.* at 324, 326.)  Ms. Laine

32

testified that the taller man was wearing a "a dark color hood over" his head, "black jean pants," and "black shoes with trimming white-something on the shoes." (*Id.* at 324-25.) Ms. Laine heard the shorter man say: "Go ahead.  Go ahead.  Shoot. Shoot." (*Id.* at 326.)  Ms. Laine moved away from her window, and then heard a gunshot. (*Id.* at 327.)  She looked out again to see the shorter man "stumbling." (*Id.*)  After the shooting, Ms. Laine went outside with her husband to tend to the victim, and one of her neighbors, a "Puerto Rican guy," came outside to help as well. (*Id.* at 329.)

The testimony of Mr. Hodge, an eyewitness who knew Petitioner and the victim, directly implicated Petitioner in the shooting for which he was convicted.  The testimony of Ms. Laine, also an eyewitness, corroborated certain details of Mr. Hodge's testimony, including what the shooter was wearing, what the victim said immediately before the shooting, and which person from the neighborhood came outside to help in response to the shooting.  The court notes that Petitioner was convicted of first-degree manslaughter, which required only that he acted with "intent to cause serious physical injury to another person," with death resulting from that intent.  N.Y. Penal Law § 125.20(1).  Given the testimony of Mr. Hodge and Ms. Laine, a jury could have found that Petitioner shot the victim with the requisite intent.  Accordingly, the admission of evidence

related to the shooting of Mr. Williams did not violate Petitioner's due process rights.

### VII. Ground Six: Excessive Sentence

Finally, Petitioner argues that his consecutive sentences, which totaled at least forty-two years of imprisonment, were excessive. (Pet. at 4.) Petitioner notes that he was 19 years old at the time of the crime, and that he was a first-time offender. (*Id.*)

"It is well-established that an excessive sentence claim will not prevail as a ground for habeas corpus relief if the imposed sentence was within the limits prescribed by state law." *Thompson v. Lord*, 322 F. Supp. 2d 300, 301 (E.D.N.Y. 2004) (citing *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992)). Petitioner was sentenced to 25 of imprisonment for his first-degree manslaughter conviction. (Tr. at 712.) Under New York law, "[m]anslaughter in the first degree is a class B felony," N.Y. Penal Law § 125.20, making the permissible range of prison sentences between five years and 25 years, *id.* at § 70.02(3)(a). Petitioner was sentenced to 15 years of imprisonment for his conviction for second-degree criminal possession of a weapon. (Tr. at 713.) Under New York law, "[c]riminal possession of a weapon in the second degree is a class C felony," N.Y. Penal Law § 125.20, punishable by a maximum term of imprisonment of 15 years, *id.* at § 70.00(2)(c).

34

Lastly, the trial court sentenced Petitioner to between two-and-a-third years and seven years for his third-degree bribery conviction.  (Tr. at 713.)  "Bribery in the third degree is a class D felony," N.Y. Penal Law § 200.00, punishable by a maximum term of imprisonment of seven years, *id.* at § 70.00(2)(d).  The sentencing court had discretion to order all of his sentences to run consecutively, which it did.  *See Setser v. United States*, 566 U.S. 231, 236 (2012) ("Judges have long been understood to have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences that they impose, or that have been imposed in other proceedings, including state proceedings."); *see also United States v. Ojeda*, 946 F.3d 622, 628 (2d Cir. 2020) ("courts generally have discretion to order that a sentence run concurrently or consecutively").

Thus, although Petitioner received the maximum or near maximum prison sentences for each of his three convictions, the sentences with respect to each were within the permissible ranges under state law.  Petitioner, therefore, cannot state a claim that his sentence was unconstitutionally excessive.  *See White*, 969 F.2d at 1383.

## Conclusion

For the reasons stated above, Mr. Viera's petition and amended petition for a writ of habeas corpus are DENIED in their

entirety.  Because Mr. Viera has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue.  28 U.S.C. § 2253(c); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (discussing certificate of appealability standard); Rules Governing Section 2254 and 2255 Cases, Rule 11 ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").

The Clerk of Court is respectfully directed to enter judgment in favor of Respondent, serve a copy of this Memorandum and Order and the judgment on Mr. Viera, note service on the docket, and to close this case.

**SO ORDERED.**

Dated:      Brooklyn, New York
            June 30, 2020

                                        /s/
                                _____
                                Hon. Kiyo A. Matsumoto
                                United States District Judge

36